[Cite as *In re M.L.*, 2023-Ohio-3541.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re M.L.

Court of Appeals No. L-23-1127

Trial Court No. JC 23292584

<u>**DECISION AND JUDGMENT**</u>

Decided: September 29, 2023

* * * * *

Anthony R. McGeorge, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} This matter is before the court on appeal from the judgment of the Lucas County Court of Common Pleas, Juvenile Division, granting permanent custody of M.L., (d.o.b. 1/23/23) to Lucas County Children Services. Finding no error, we affirm.

## II. Facts and Procedural Background

{¶ 2} At the birth of M.L. on January 23, 2023, appellant, T.L., tested positive for marijuana and admitted to three instances of ingesting marijuana edibles during the pregnancy, including the day of birth. M.L.'s umbilical cord tested positive for THC. As a result of the positive test and because other children had been removed from T.L.'s care, Lucas County Children Services (LCCS) received a referral from the hospital. On January 25, 2023, LCCS sought an ex parte order to place M.L. in shelter care, which the juvenile court granted. The hospital discharged M.L. to the custody of LCCS.

{¶ 3} On January 26, 2023, LCCS filed a complaint in dependency and neglect and a motion for shelter care hearing, seeking temporary custody. That same day, the juvenile court held an evidentiary hearing on the motion for shelter care. T.L. appeared with counsel.[1] LCCS argued for continuance in shelter care, noting T.L.'s other pending cases for M.L.'s siblings, case Nos. JC 20279816, JC 21285153, and JC 21286099. The juvenile court awarded interim temporary custody of M.L. to LCCS.

{¶ 4} On January 27, 2023, LCCS filed an amended complaint, seeking permanent custody of M.L. The juvenile court appointed a guardian ad litem (GAL) for M.L., and LCCS submitted its case plan and administrative review. T.L. did not participate in case services.

---

[1] T.L. did not know the father's identity, and LCCS listed the father in the complaint as John Doe. No father was ever identified.

{¶ 5} On March 30, 2023, T.L. moved to replace the GAL, arguing the current GAL "is not fair and impartial and is against her." The appointed GAL was involved in T.L.'s other pending cases, involving some of her other children. On April 11, 2023, the juvenile court denied the request, and affirmed the trial date of April 18, 2023.

{¶ 6} On April 18, 2023, the juvenile court held a trial for adjudication and disposition regarding the complaint in dependency and neglect, and trial on the complaint for permanent custody. Counsel for T.L. was present, but T.L., herself, did not appear for trial. As to T.L.'s absence, her trial counsel stated, "I had contact with my client shortly after the pretrial. She knew of today's date, and she's not appeared and I have not been able to reach her by text message this morning." The GAL and witnesses for LCCS appeared and gave testimony.

{¶ 7} In the adjudication hearing, Jaime Mancha and Randy Woodall testified on behalf of LCCS. Mancha testified she is an assessment caseworker for LCCS, and she received the referral from the hospital after M.L. was born. The hospital notified LCCS that T.L. tested positive for marijuana at the time of delivery, and the hospital had notice of T.L.'s ongoing involvement with LCCS, based on T.L.'s prior cases resulting in T.L. losing custody, as well as current cases in which some of her children were in the care of LCCS.

{¶ 8} Mancha met with T.L. in the hospital and addressed the allegations with T.L., who admitted to ingesting marijuana edibles on three occasions, including the day

3.

of delivery. T.L. also admitted to consuming alcohol before she knew she was pregnant with M.L. T.L. told Mancha that she wanted nothing to do with LCCS.

{¶ 9} Next, Randy Wooddall testified. Wooddall was the ongoing caseworker for LCCS, assigned to the case, and she had worked with T.L. since August of 2021 concerning six of T.L.'s older children. Prior to Wooddall's involvement, T.L.'s history with the agency dated back to 2003.

{¶ 10} To Wooddall's knowledge, T.L. did not have custody of any of her children. During the period in which Wooddall worked with T.L., T.L. did engage in counseling services prior to M.L.'s birth, relative to a prior case, but asked to be removed from case plan services and did not engage in services during the pendency of the present case.

{¶ 11} The juvenile court admitted LCCS's exhibits in support of adjudication, with stipulated objections, along with the GAL's report. T.L.'s trial counsel called no witnesses and presented no evidence for the purposes of adjudication.

{¶ 12} Counsel for LCCS argued that the agency met the standards for neglect and dependency under R.C. 2151.04(D)(2) and 2151.03(A)(2). Specifically, LCCS noted L.T. had children already in care, with reunification with L.T. unlikely in the foreseeable future. LCCS also noted T.L. could not provide adequate physical care due to her unaddressed issues, also at issue in the prior cases.

{¶ 13} Trial counsel for T.L. waived closing argument.

4.

{¶ 14} Based on the evidence presented during the adjudication portion of hearing, the juvenile court found by clear and convincing evidence that M.L. is a dependent and neglected child pursuant to R.C. 2151.04(D)(2) and 2151.03(A)(2).

{¶ 15} The court then proceeded to trial regarding disposition. At the request of LCCS, the juvenile court admitted all exhibits admitted in the adjudication hearing for consideration in the disposition determination.

{¶ 16} Regarding disposition, LCCS again presented the testimony of Gooddall, the ongoing caseworker, who indicated T.L. completed some of her case plan in the 2021 case, but T.L. obtained diagnoses and recommendations in that case and left treatment against advice. Gooddall did not have current information on T.L.'s treatment because T.L. refused to provide a release for current records. Additionally, Gooddall testified that she could not confirm T.L.'s claim she had stable housing because of ongoing threats by T.L. against Gooddall, making a home visit unsafe for Gooddall.

{¶ 17} Gooddall testified that T.L.'s completion of services was limited to completing a parenting program in 2021, but as of January 2022, T.L. no longer had an active case plan, having requested removal from services. Between January and June 2022, Wooddall had no contact with T.L., and T.L. stopped visiting her other children. Wooddall testified that LCCS was awarded permanent custody of two of T.L.'s older children, J.H. and S.L. Two older children, Dai.L. and Dam.L. were in the custody of LCCS in a planned permanent living arrangement, close to the age of emancipation, A.L.

5.

was in the custody of her father, Mon.L. was in custody of a paternal relative, and A.L. was in the legal custody of his father, with LCCS retaining protective supervision.

{¶ 18} As to M.L., Gooddall testified that T.L. has Level 1, supervised visitation, and she visits with M.L. weekly and is "very loving toward the child," with no inappropriate behavior toward M.L. The only issue arising from visitation related to T.L.'s concerns about the foster parents' care, but investigation showed these concerns had no merit. Gooddall acknowledged that T.L. claimed to be receiving mental health services, but because T.L. refused to sign a release for those records, Gooddall could not confirm this claim. Gooddall also testified that no father has ever been identified, and no maternal relatives have been deemed appropriate for placement.

{¶ 19} The GAL testified last, and she indicated she had been assigned to the prior case with six of T.L.'s other children. The GAL was assigned to the present case, right after M.L.'s birth. The GAL testified she has known T.L. since 2018.

{¶ 20} The GAL's investigation in M.L.'s present case was limited, with no investigation of T.L.'s housing and little communication with T.L. The GAL testified that T.L. "doesn't return calls." The GAL did observe T.L. during her visits with M.L. and found T.L. to be appropriate with the child and even attentive, something the GAL had not noted in the prior case with other children. Despite this, the GAL testified that T.L would not be an appropriate parent due to her ongoing and apparently untreated mental health and substance abuse issues. Additionally, the GAL testified that T.L. had

6.

resisted all attempts to work with her to obtain housing and get treatment in the past, and T.L. also threatened the GAL in prior cases.

{¶ 21} As to M.L.'s current placement, the GAL admitted she generally met with M.L. and his foster parents on the phone or Facetime, based on the distance of M.L.'s placement in Lyons, Ohio. However, the GAL did have at least one in-person meeting with the foster parents at the Agency. T.L. appeared to be doing well in foster care. The GAL acknowledged that T.L. complained about the foster parents, claiming M.L. was dirty and not properly cared for. She testified that she investigated T.L.'s claims and found no truth to the allegations. The GAL also testified that the foster parents expressed an interest in adopting M.L

{¶ 22} LCCS called no more witnesses and rested. T.L.'s trial counsel called no witnesses and rested without presenting any evidence.

{¶ 23} In closing, LCCS argued that it met the burden of proof of clear and convincing evidence under R.C. 2151.414(E)(1), (2), (4), and (11). LCCS argued that T.L. made little progress since losing permanent custody of two older siblings in 2021. For example, LCCS noted T.L.'s mental health and substance abuse issues that have been left apparently untreated, with T.L.'s lack of cooperation in signing releases preventing LCCS from investigating T.L.'s progress. LCCS also argued that T.L.'s lack of cooperation demonstrated her lack of commitment. In addition to her refusal to sign releases, T.L. denied access to her home, initially by refusing to provide an address and, in this case, threatening caseworkers, making home visits unsafe for LCCS staff. T.L.

7.

also demonstrated a history of failing to engage in case services, with her last participation in services ending in January 2022. Finally, LCCS argued that M.L. had been in the agency's custody since his release from the hospital after his birth. LCCS argued that it would be in the best interest of M.L. to grant permanent custody to LCCS.

**{¶ 24}** T.L.'s trial counsel argued that T.L. successfully completed a parenting course in her prior case, and she regularly visited M.L., with those visits "productive for the child." Accordingly, counsel asked the court to deny the request for permanent custody.

**{¶ 25}** Following the hearing, the juvenile court granted permanent custody of M.L. to LCCS. On April 25, 2023, the court filed its judgment entry, with findings of fact and conclusions of law, addressing the statutory factors that applied to the determination that M.L. cannot and should not be placed with his mother as demonstrated by clear and convincing evidence.

**{¶ 26}** This appeal followed.

### III. Assignments of Error

**{¶ 27}** On appeal, T.L. asserts the following assignments of error:

1. The trial court's finding that the child cannot be placed with mother within a reasonable time or should not be placed with his mother pursuant to R.C. 2151.414(E)(1) was not supported by clear and convincing evidence.

8.

2. The trial court's finding mother has a mental illness so severe that she cannot provide a suitable home for the child herein pursuant to R.C. 2151.414(E)(2) was not supported by clear and convincing evidence.

3. The trial court's finding that mother demonstrated a lack of commitment to the children [sic.] by failing to regularly support, visit, or communicate with the children [sic.] when able to do so pursuant to "R.C. 2151.414(E)(4) was not supported by clear and convincing evidence.

4. The trial court's finding mother did not rebut the presumption against custody after having parental rights to another child terminated pursuant to R.C. 2151.414(E)(11) was not supported by clear and convincing evidence.

{¶ 28} We address the assignments of error in order.

### IV. Analysis

{¶ 29} In reviewing the juvenile court's decision to terminate parental rights and award permanent custody to LCCS, we must determine whether the juvenile court's findings are supported by the manifest weight of the evidence. *In re A.H.,* 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11. "Reversal is proper only where [it is] determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a

9.

manifest miscarriage of justice that the judgment must be reversed." *In re N.J.,* 6th Dist. Lucas No. L-23-1114, 2023-Ohio-3190, ¶ 38, citing *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 30} In a review based on manifest weight, we recognize that the juvenile court is in the best position to weigh evidence and evaluate testimony, so "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *In re A.E.,* 6th Dist. Lucas No. L-23-1043, 2023-Ohio-2310, ¶ 58, quoting *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984).

{¶ 31} Before terminating parental rights and granting permanent custody to LCCS under R.C. 2151.414, the juvenile court must first find, by clear and convincing evidence, that (1) one of the enumerated factors under R.C. 2151.414(B)(1)(a)-(e) apply and (2) that permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

10.

{¶ 32} As an initial matter, we note that T.L. only disputes the juvenile court's award of permanent custody, with no challenge to the findings regarding dependency and neglect. Additionally, as to permanent custody, T.L. disputes only the findings under R.C. 2151.414(E)(1), (2), (4), and (11), and she does not dispute the findings supporting the best interests of the child determination, pursuant to R.C. 2151.414(D).

{¶ 33} Under R.C. 2151.414(B)(1)(a), a court may grant permanent custody of a child when it is in the best interests of the child, by clear and convincing evidence, and the child has not been in the temporary custody of the agency for twelve or more months within a consecutive twenty-four-month period and the evidence demonstrates "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." In making the determination of whether the child can be placed within a reasonable time, the juvenile court considers the factors under R.C. 2151.414(E). Here, the juvenile court determined that the factors under (E)(1), (2), (4), and (11) applied. As stated in R.C. 2151.414(E):

> * * * If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child

when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

T.L.'s sole challenge to the judgment, in this case, concerns these factors. We address each challenge in turn.

### A. T.L. failed to remedy the problems that cause M.L. to be placed outside the home.

{¶ 34} In her first assignment of error, T.L. argues that the juvenile court erred in determining she failed to remedy the problem which caused the removal of M.L. from her care. In support, she does not dispute that she tested positive for marijuana at M.L.'s birth or that M.L.'s umbilical cord tested positive for THC, but instead relies on actions taken prior to M.L.'s birth, relative to a prior case involving siblings of M.L. In response, LCCS cites to the evidence in the present case.

13.

{¶ 35} At trial, L.T.'s ongoing caseworker testified that L.T. was diagnosed with substance abuse disorders, but refused treatment, believing the diagnoses incorrect. L.T. admitted to ingesting marijuana edibles during the pregnancy, and while she argues the lack of later positive tests, the record does not contain verified information after the birth of M.L. because L.T. did not participate in case plan services and refused to execute releases to permit LCCS access to her treatment and other records.

{¶ 36} Considering the record, we find the evidence supported the juvenile court's finding under R.C. 2151.414(E)(1), by clear and convincing evidence, that T.L. failed to continuously and repeatedly to substantially remedy the substance abuse issues that caused M.L. to be removed from her home. We find T.L.'s first assignment of error not well-taken.

### B. T.L.'s mental health and substance abuse issues are so severe they prevent her from providing an adequate permanent home.

{¶ 37} In her second assignment of error, T.L. argues that the record did not demonstrate her mental health and substance abuse issues prevented her from providing an adequate home, based on her regular visits with M.L. during the pendency of the case and her claim she was receiving mental health treatment. In response, LCCS argues that T.L.'s mental illness and chemical dependency were evident in the record, and supported the juvenile court's finding.

{¶ 38} T.L. does not dispute her mental health or substance abuse diagnoses, or that her illness provided a basis, in part, for an award of permanent custody as to M.L.'s

14.

siblings in 2021. Instead, T.L. argued that she is receiving counseling, but she also refused to execute releases that would provide records of this counseling to LCCS. Records that the agency did possess, from the prior case, indicated that T.L. displays poor judgment in her behaviors and choices. In the present case, while T.L. did visit with M.L., she also refused to engage with her caseworker and attempt case plan services, and T.L. threatened her caseworker, preventing a home investigation.

{¶ 39} Based on the record, we find clear and convincing evidence supported the juvenile court's determination under R.C. 2151.414(E)(2), that T.L.'s mental health and other issues are so severe that T.L. is unable to provide an adequate permanent home. We find T.L.'s second assignment of error not well-taken.

### C. T.I. demonstrated an unwillingness to provide an adequate permanent home.

{¶ 40} In her third assignment of error, T.L. argues that she did not demonstrate an unwillingness to provide an adequate, permanent home to M.L. In support, T.L. argues that testimony demonstrated she was loving and appropriate with M.L., and regularly appeared for her weekly visits. In response, LCCS argues that, aside from visits, T.L.'s lack of cooperation with LCCS demonstrated an unwillingness to provide an adequate, permanent home.

{¶ 41} The record demonstrated that T.L. regularly attended her weekly, supervised visits with M.L. As noted by LCCS, however, T.L. did not cooperate with an investigation of her housing, but instead made threats to her caseworker that prevented

15.

any investigation. T.L.'s history, moreover, demonstrated that adequate housing had been an issue relative to T.L.'s prior cases, with M.L.'s siblings removed from T.L.'s care, in part, based on a lack of furniture or beds in the home. Additionally, T.L.'s general refusal to work with the caseworker to address concerns demonstrated an unwillingness to provide an adequate permanent home for M.L.

{¶ 42} The record supported the juvenile court's finding under R.C. 2151.414(E)(4), by clear and convincing evidence, that T.L. demonstrated an unwillingness and lack of commitment to providing an adequate, permanent home. We find T.L.'s third assignment of error not well-taken.

**D. T.I.'s parental rights were terminated as to one or more of M.L.'s siblings, and T.I. failed to rebut the resulting presumption and demonstrate that, notwithstanding the prior termination, she can provide a legally secure permanent placement and adequate care for M.L.**

{¶ 43} In her fourth and final assignment of error, T.L. argues that LCCS failed to prove that she lost custody of a sibling of M.L., raising novel argument regarding the effect of termination of parental rights on the legal definition of "sibling," contained with R.C. 2151.414(E)(11). In response, LCCS argues that construing the statute as T.L. argues would result in an absurdity.

{¶ 44} T.L. does not dispute that she previously lost custody and her parental rights were terminated for two of her other children, prior to M.L.'s birth. Instead, she argues that R.C. 2151.414(E)(11) refers to prior, involuntary termination "with respect to a sibling of the child," and after termination, the other children are no longer "siblings" of

16.

M.L., rendering this factor inapplicable to her case. T.L. also cites to nothing within R.C. Chapter 2151 that defines "sibling" as a relationship emanating solely from legal, parental rights. Moreover, T.L. did not raise this argument in the juvenile court.

{¶ 45} "It is a cardinal rule of statutory construction that a statute should not be interpreted to yield an absurd result." *State v. Roberts,* 150 Ohio St.3d 47, 2017-Ohio-2998, 78 N.E.3d 851, ¶ 47, quoting *Mishr v. Poland Bd. of Zoning Appeals*, 76 Ohio St.3d 238, 240, 667 N.E.2d 365 (1996). Applying the ordinary meaning of "sibling," T.L.'s other children fall within the definition, as "[o]ne of two or more persons having one or esp. both parents in common; brother or sister." *In re Daniels,* 3d Dist. No. 17-02-24, 2002-Ohio-6256, ¶ 16, quoting American Heritage Dictionary, Second College Edition, 1137 (1985). On the other hand, in applying T.L.'s interpretation of "sibling," R.C. 2151.414(E)(11) would never apply in any situation in which there was a prior termination of parental rights, an absurd reading of the statute.

{¶ 46} Based on the record, therefore, including T.L.'s acknowledgement of prior terminations of parental rights for two of her children, and the failure of T.L. to demonstrate facts that rebut the presumption under R.C. 2151.414(E)(11), we find the juvenile court's finding in this regard supported by clear and convincing evidence. T.L.'s fourth and final assignment of error, accordingly, is not well-taken.

## V. Conclusion

**{¶ 47}** For the forgoing reasons, we affirm the judgment of the Lucas County Court of Common Pleas, Juvenile Division, awarding permanent custody of the child to LCCS. Appellant, T.L., is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                               _____
                                                           JUDGE

Gene A. Zmuda, J.

Myron C. Duhart, P.J.                             _____
CONCUR.                                                         JUDGE

                                                             _____
                                                           JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.